UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

SHELTER PRODUCTS, INC.  CIVIL ACTION NO. 12-cv-2533

VERSUS

AMERICAN CONSTRUCTION HOTEL  MAGISTRATE JUDGE HORNSBY
CORP., ET AL

## MEMORANDUM RULING

**Introduction**

Ganga, LLC ("Ganga") built a new hotel in Bossier City, Louisiana.  The general contractor for the project was American Construction Hotel Corporation ("ACHC"), which subcontracted the framing work to Cratus Development, LLC ("Cratus").  Cratus purchased lumber for the job from Shelter Products, Inc.

Cratus did not pay for all of the lumber it ordered. Shelter filed this suit against Cratus, ACHC, and Ganga.  The complaint alleges that Cratus breached the purchase order and failed to pay on open account.  Cratus did not answer, and the clerk has entered a default against it. Shelter alleges that ACHC (1) breached a joint check agreement that obligated it to pay Shelter any amounts Cratus did not pay and (2) violated the Louisiana Unfair Trade Practices Act ("LUTPA") when ACHC attempted to modify the terms of the joint check agreement.  Shelter also makes a claim against Ganga under the LUTPA for allegedly not giving Shelter notice of substantial completion as required by Louisiana lien statutes.

ACHC and Ganga filed a Motion for Summary Judgment (Doc. 28) and attacked all claims against them.  Shelter opposed the motion and filed its own Motion for Partial Summary Judgment (Doc. 31) to seek a ruling in its favor on its breach of contract claim against ACHC.

**Relevant Facts**

The underlying debt in this case stems from a "Bid Acceptance" agreement between Shelter and Cratus. The agreement identifies Cratus as the buyer and states: "Shelter Products, Inc. hereby offers to sell to the above Buyer the following goods on the terms and conditions set forth in this Bid Acceptance." It lists in detail the lumber items to be provided, the prices for each, and conditions related to shipping, quality of goods, payment terms, and the like.  The "Grand Total Sell" figure is $92,291.  The agreement states that it constitutes the entire agreement between buyer and seller.  It also states that Shelter's obligation to ship lumber is contingent on Cratus qualifying for credit approval, which shall be determined in Shelter's discretion.  The agreement was signed by representatives of Cratus and Shelter on October 3, 2011.   The general contractor, ACHC, is not mentioned anywhere in the agreement and is not a signatory.

At the center of this case is a joint check agreement that representatives of Cratus and Shelter also signed on October 3.  General contractors often use joint checks to make sure subcontractors properly pay suppliers.  The general contractor issues a "joint check" payable to both the subcontractor and supplier, so the check cannot be cashed until endorsed by both parties.  The subcontractor and supplier can work out the details of who gets what portion

of the check.  Suppliers often request joint check arrangements to give them another avenue,
together with the potential for filing a lien, to protect their rights and obtain payment.  1
Construction Contracts Deskbook, § 21:1.

The facts are not clear about which party requested a joint check agreement, but one
was prepared.  It states that is "Re: WinGate Inn, Bossier City, La." and contains the
following provisions:

(1)   "[ACHC] hereby agrees to make payments to Shelter Products, Inc. and Cratus
Development by joint check for the lumber contract(s) on the above referenced project(s).
Any refunds will be paid to Cratus Development."

(2) "If Cratus Development does not start or complete work on this project, and/or
becomes past due with Shelter Products, Inc. to the extent that Shelter Products, Inc. can no
longer extend credit to Cratus Development, [ACHC] will make payments directly to Shelter
Products, Inc. for all outstanding and unpaid invoices for materials delivered to the job site
and [ACHC] agrees to purchase remaining unshipped material at the prices agreed upon by
Cratus Development.  Should this item become necessary, a copy of the original Bid
Acceptance will be provided to [ACHC] by Shelter Products, Inc."

(3)  Below the signature lines for the three parties, a paragraph discusses the use of
facsimile signatures and then states: "This agreement can be altered only with the unanimous
consent of all parties."

Representatives for Shelter and Cratus signed the agreement and dated it October 3,
2011.  The following day, a project manager for Cratus emailed the partially executed
agreement to Barbara Graves at ACHC.  The manager asked that the document be signed and
returned to him.  Ms. Graves replied that she would have Brand Eigen sign it when he
returned from Louisiana.  Ms. Graves stated in her email that Mr. Eigen "will want me to
put an amount not to exceed, do you know how much in materials you'll need to buy?"  The

Cratus manager replied that the current total was $92,291 but there could be a need for more items.  He added: "I need this signed before they cut loose the lumber."

Brand Eigen, the president and 100% owner of general contractor ACHC, testified in a deposition that he assumed subcontractor Cratus made the arrangements to purchase the framing materials from Shelter.  ACHC was not involved in that decision.  Eigen could not recall why ACHC made payment to Shelter and Cratus by joint check, but he guessed it might be at the request of Cratus.  He said it was his company's practice to make payment by joint check to subcontractors and suppliers unless he received an unconditional lien waiver.

Mr. Eigen, without discussing it with anyone from Shelter or Cratus, added below the signature lines a handwritten notation: "Not to exceed $92,291."  He wrote his initials beside the handwritten addition.  He signed the agreement and dated it October 4, 2011.  Eigen, in his testimony, described his addition to the form as a counteroffer.  He said he was otherwise satisfied with the contents of the agreement.

Eigen was asked if he anticipated that Cratus and Shelter would add their initials to his beside the limiting language.  He answered: "I don't know if I anticipated they would initial next to it, but I probably would anticipate that they would send something that they agreed with that."  He said most joint check agreements come with a "not to exceed" dollar amount already on them.  If the proposed agreements do not, he asks for an appropriate limitation amount.

Eigen returned the signed document to ACHC coworker Barbara Graves, but he does not know what she did with it.  He assumed Ms. Graves sent the agreement to someone at Cratus or Shelter, but he did not know.  ACHC stated in an answer to an interrogatory that Barbara Graves forwarded the joint check agreement as amended and signed to the project manager at Cratus, "who ACHC assumed forwarded it to representatives at Shelter." Presumably, Shelter received the executed/modified agreement or suitable confirmation that it had been signed; it began shipping lumber on credit soon after the signing date.

Shelter states in a brief that it shipped lumber to the job site at the request of Cratus from October to December 2011.  Shelter invoiced Cratus.  ACHC issued one joint check in November 2011 payable to Shelter and Cratus for $20,352.  Shelter did not receive any other payments.

The original motions did not provide specific evidence of when Shelter first received the version of the joint check agreement with the limitation language added.  The court ordered the record supplemented with evidence of when Shelter became aware of the "not to exceed" language.  Shelter offered the statement of sales manager Dustin Cook, who said that Shelter first became aware of the language on December 19, 2011 through an email sent by Barbara Graves to Shelter employee Michelle Moore.  The December 19 email from Graves (ACHC) asked Moore (Shelter) about some details on an invoice and explained that Graves wanted to make sure they were all on the same page "because the joint check agreement was not to exceed $92,291 and obviously we have surpassed that."  Cook states in his affidavit that Ms. Moore promptly forwarded me and Shelter's Director of Credit a

copy of Ms. Graves's email along with a copy of the modified Joint Check Agreement." A copy of Ms. Moore's email indicates that she wrote to Dustin Cook and two other persons to make them aware of "a possible issue with the joint check agreement." She stated: "I have attached a copy of the original joint check agreement with a note that it is not to exceed $92K." She added that there was an open balance of more than $126,000.

Neither Cook's affidavit nor Moore's emails make clear where Moore got the copy of the joint check agreement. Had it been in a file at Shelter since October when it was signed, but only retrieved and circulated when the nonpayment issue arose? Or did Ms. Moore send Shelter its first copy of the modified agreement during the December discussions? There is no indication of a December email from Ms. Moore sending a copy, but there is no other direct evidence of when Shelter first received a copy of the agreement. If the parties know, they have not clearly communicated this fact in their submissions.

Shelter sent a notice of nonpayment to ACHC and Ganga in February 2012 and stated that the balance due on Cratus's account was more than $125,000. ACHC has since taken the position in discovery answers that there was no meeting of the minds  as to the "proposed" joint check agreement because neither Shelter nor Cratus ever indicated acceptance of the limitation clause added by ACHC. ACHC's discovery response added that its "counteroffer" to enter a joint check agreement not to exceed $92,291 is withdrawn, meaning it would bear no responsibility to pay for any of the lumber.

**Effect of the Joint Check Agreement**

ACHC invokes the general rule of Civil Code Article 1943 that "[a]n acceptance not in accordance with the terms of the offer is deemed to be a counteroffer."  It contends that the limiting language added by Mr. Eigen was not in accordance with the terms of the offer, so the document ACHC signed was a counteroffer that was never accepted and, after demand for payment was made, was withdrawn.

Shelter argues that the transaction regarded a sale of lumber, so the agreement is more properly governed by the code articles under the chapter on sales of movables.  Civil Code Article 2601 states that "[a]n expression of acceptance of an offer to sell a movable thing suffices to form a contract of sale if there is agreement on the thing and the price, even though the acceptance contains terms additional to, or different from, the terms of the offer, unless acceptance is made conditional on the offeror's acceptance of the additional or different terms."  Where there is no such condition, the additional or different terms are regarded as "proposals for modification and must be accepted by the offeror in order to become a part of the contract."  A different rule applies to transactions between merchants. The article provides that, for merchants, additional terms become part of the contract unless they alter the offer materially, meaning when their nature is such that it must be presumed the offeror would not have contracted on those terms.  Comment (g) under the article states that a clause relative to the extent of the parties' liability is an example of such a term. Shelter argues that the limiting language added by ACHC was a material alteration that did

not become part of the joint check agreement, and the agreement is therefore enforceable to the full extent of the debt.

The bid acceptance between Cratus and Shelter is fairly described as a sale of movables, but the joint check agreement is a separate document that is not incorporated by reference or otherwise made a part of the bid acceptance regarding the purchase of lumber. The court finds that the  joint check agreement is not a sale of movables.  Rather, it is a contract of suretyship, which Civil Code Article 3035 defines as "an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so."  That is precisely what ACHC did when it signed the joint check agreement and promised Shelter (the creditor) that it would fulfill the obligation of Cratus under the bid acceptance if Cratus failed to perform.

One might argue that ACHC made itself a party to the contract for the sale of lumber by agreeing to make payments for the lumber ordered by Cratus and agreeing to purchase even unshipped material if Cratus should default.  ACHC is nonetheless a surety because "[o]ne who ostensibly binds himself as a principal obligor to satisfy the present or future obligations of another is nonetheless considered a surety if the principal cause of the contract with the creditor is to guarantee performance of such obligations."  La. Civ. Code art. 3037. The court finds that the principal cause of the joint check agreement was to guarantee Cratus's performance, so ACHC is considered a surety even though it ostensibly bound itself as the buyer under the bid acceptance.

ACHC argues that the lack of written agreement by the other parties regarding the amount limitation means the joint check agreement is not binding because Civil Code Article 3038 requires: "Suretyship must be express and in writing."  The joint check agreement meets both of those requirements.  It is written and expressly binds ACHC to guarantee performance of Cratus's obligations.  The lack of formal written acceptance of ACHC's limitation on its liability did not prevent the agreement from binding ACHC.  "Suretyship is established upon receipt by the creditor of the writing evidencing the surety's obligation." La. Civ. Code Art. 3039.  "The creditor's acceptance is presumed and no notice of acceptance is required." Id.  Shelter received the joint check agreement signed by ACHC no later than December 2011.  That receipt established Shelter's acceptance of the suretyship and bound ACHC to its terms, subject to the limitation of $92,291.  Shelter cannot enforce a guarantee for any greater amount because it does not possess any express writing signed by ACHC for a greater amount.

The parties debate the effect, if any, of the preprinted language that the agreement can be altered only with unanimous consent of all parties.  The agreement did not exist until ACHC added the limitation of liability language, signed the document, and the document was received/accepted by Shelter.  At that moment, the limitation (and the rest of the agreement) became effective.  Unanimous consent was thereafter required for any alterations, but the preprinted language did not prohibit ACHC from adding the limitation provision to the writing before the agreement became effective.

ACHC also argues that its handwritten "counteroffer" was withdrawn after this suit was filed.  As explained above, the suretyship agreement became effective when received by Shelter.  To the extent ACHC tried to withdraw from the agreement after this dispute arose, it is still bound for the obligations incurred by Cratus to that point.  The termination of suretyship by notice to a creditor does not affect the surety's liability for obligations already incurred by the principal obligor.  La. Civ. Code Art. 3601.  For these reasons, the court will grant Shelter's Motion for Partial Summary Judgment by holding that ACHC is bound as a surety under the joint check agreement for $92,291.

**Shelter's Claim Against ACHC Under LUTPA**

Shelter alleges in Count IV of its Amended Complaint that ACHC's addition of the limitation of liability language and attempt to enforce the provision gave rise to a cause of action under the LUTPA.  The Act declares it unlawful to engage in "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  La. R.S. 51:1405.  Louisiana courts apply this broad language to determine on a case-by-case basis what conduct violates the LUTPA.

Louisiana jurisprudence has established that a plaintiff must show that the alleged conduct "offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious."  Cheramie Services, Inc. v. Shell Deep Water Prod., 35 So.3d 1053, 1059 (La. 2010).  Conduct may offend established public policy and be unethical, yet not necessarily violate the LUTPA.  Only egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based

on LUTPA.  <u>Quality Environmental Processes, Inc. v. IP Petroleum Co., Inc.</u>, _____ So.3d _____, 2014 WL 1800081, *12 (La. 2014).

ACHC's motion attacked the breach of contract and LUTPA claims against it, but it did not offer any particular analysis of the LUTPA claim apart from its contention that there was never an agreement.  Shelter nonetheless discussed the claim in its opposition, and ACHC addressed the theory in its reply.  The claim, therefore, has been adequately addressed during the briefing process to permit its consideration on summary judgment.

The court finds that the summary judgment record simply does not present facts that could support a claim under the LUTPA.  Shelter does not identify any established public policy that has been violated, and there is no evidence of an effort by ACHC to engage in deception of any kind.  ACHC modified the proposed joint check agreement by adding language that, quite reasonably, limited its liability to the total amount of the bid acceptance agreement.  ACHC then transmitted the writing to others, and it eventually was received by Shelter.  Shelter was not prohibited from seeing the (modified) surety agreement before it began to ship lumber and, so long as it stayed within its own bid amount, it would be fully guaranteed by the instrument.

The parties reasonably disagree regarding the effects of the joint check agreement and the limiting language.  There may have been miscommunication or misunderstandings involved, but there is no evidence of fraud or the degree of misconduct that would be required to allow a verdict in favor of Shelter on a claim under the LUTPA.  ACHC is entitled to summary judgment dismissing the LUTPA claim.

**Shelter's Claim Against Ganga**

The Louisiana Private Works Act allows certain suppliers a claim against the owner of a construction project to secure payment of obligations arising out of their performance of work on the project.  Among the persons allowed a claim are those who sell movables to a contractor or sub-contractor, if the movables become component parts of the immovable or are consumed during the project.  La. R.S. 9:4802.  Any person to whom a privilege is granted under that statute may give notice to the owner of an obligation owed the person in connection with the project.  La. R.S. 9:4822(K).  When that notice has been given to the owner, the owner is required to notify the seller/claimant within three days of the filing of a notice of termination of the work or the substantial completion of the work.  Section 4822(L).

Shelter alleges in Count V of its Amended Complaint that it provided notice to Ganga (the owner) of its contract with subcontractor Cratus and Cratus's nonpayment.  ¶ 41.  Unbeknownst to Shelter, a notice of substantial completion of the project was later filed on August 3, 2012.  ¶ 45.  Ganga did not notify Shelter at any point that the notice of substantial completion had been filed.  ¶ 46.  Shelter did not become aware of the notice of substantial completion until August 31, 2012, at which point it did file a lien under the Private Works Act.  ¶ 47.  Shelter alleges that Ganga's willful failure to notify it as required by the statute was an unfair or deceptive act or practice.  It also alleges that Ganga contested the Shelter lien as untimely.  ¶¶ 48 - 49.  Shelter alleges that Ganga is liable under the LUTPA for

relying upon its deceptive act to build a defense to lien rights Shelter might otherwise have against Ganga.  ¶¶ 50 - 51.

Ganga's discussion of this claim in its Motion for Summary Judgment contends that this claim can be resolved based solely on the face of the pleadings, and no summary judgment evidence is cited.  But Ganga's argument, as well as the response by Shelter, go beyond the allegations in the Amended Complaint and discuss whether (1) the lien was actually timely filed despite the notice and (2) other alleged reasons that Shelter's lien was deficient.  The court cannot decide a case based on arguments by counsel in a memorandum that are not supported by competent summary judgment evidence.  Ganga began its attack on this claim by stating that it was confined to the pleadings, in the nature of a motion to dismiss under Fed. R. Civ. Pro. 12(b)(6), so the court will consider only allegations in the Amended Complaint.

Shelter alleges that Ganga violated an express statutory directive that it provide Shelter notice of substantial completion of the project so that Shelter could timely assert any lien rights.  Ganga is alleged to have known that Shelter had a claim for a significant amount of money due for lumber used on the project, but Ganga did not give Shelter the statutorily required notice, and it then relied on Shelter's delay in filing a lien to defend against it.  The court finds that these allegations are sufficient to state a plausible claim under the LUTPA that survives review of the pleadings and must be resolved by more substantive means such as a motion for summary judgment that includes competent evidence regarding the underlying facts.  For now, the claim against Ganga survives.

**Conclusion**

Shelter's **Motion for Partial Summary Judgment (Doc. 31)** is **granted** by holding that ACHC is bound as a surety under the joint check agreement up to the amount of $92,291.  The **Motion for Summary Judgment (Doc. 28)** filed by ACHC and Ganga is **granted in part** by dismissing the claim against ACHC under the LUTPA and is **denied** in all other respects.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 26th day of June, 2014.

Mark L. Hornsby
U.S. Magistrate Judge